FILED

2025 Aug-22  PM 04:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JAMES RONALD LOGAN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2 :24-cv-01348-MHH** |
| | } | |
| **RONALD VERNARR** | } | |
| **HUGHES, TIM ROSS, JUSTIN** | } | |
| **SELF, CITY OF HOMEWOOD,** | } | |
| **ALABAMA,** | } | |
| | } | |
| **Defendants.** | | |

## <u>MEMORANDUM OPINION</u>

On October 15, 2022, former Homewood Police Officer Ronald Hughes shot plaintiff James Logan six times.  (Doc. 1).  In this lawsuit, Mr. Logan asserts an individual capacity excessive force claim against Officer Hughes under 42 U.S.C. § 1983 and an assault and battery claim against him under Alabama law.  (Doc. 1, p. 11-13, 18-19).  Mr. Logan also asserts individual capacity § 1983 claims against former Homewood Chief of Police Tim Ross and Homewood Police Officer Justin Self, who oversaw officer training, and a municipal liability claim against the City of Homewood for an unconstitutional custom or policy, ratification, and failure to train. Finally, Mr. Logan asserts Alabama state law negligence and wantonness claims against the City of Homewood, former Chief Ross, and Officer Self.  (Doc. 1, pp. 2-

3, 13-18, 19-21). Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the defendants have asked the Court to dismiss Mr. Logan's claims against them. (Docs. 7, 9, 14). The defendants contend that they are immune from Mr. Logan's claims.

To resolve these motions, the Court first sets forth the standard for motions to dismiss under Rule 12(b)(6). Then, the Court describes the factual allegations in Mr. Logan's complaint that precede Officer Hughes's bodycam footage and the events captured in Officer Hughes's body camera recording. Finally, the Court evaluates the factual allegations and the facts established in the video recording under the legal standards that govern the defendants' immunity defenses.

## I.

Rule 12(b)(6) allows a defendant to move to dismiss claims within a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "A complaint is subject to dismissal under Rule 12(b)(6) when its factual allegations, on their face, establish an affirmative defense that bars recovery." *Myrick v. Fulton Cnty., Ga.*, 69 F.4th 1277, 1297 (11th Cir. 2023) (citing *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022)). "That means that if a defendant raises the affirmative defense of qualified immunity, the district court must dismiss any claims that do not allege a violation of clearly established law." *Myrick*, 69 F.4th at 1297. Officer Hughes has raised the affirmative defense of qualified immunity with respect to Mr.

Logan's § 1983 excessive force claim.

Similarly, Officer Hughes has raised the affirmative defense of state agent immunity with respect to Mr. Logan's state law claim for assault and battery. (Doc. 10, pp. 14-19). Under Alabama law, a state agent is "immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . exercising judgment in the enforcement of the criminal laws of the State." *Ex parte City of Homewood*, 231 So. 3d 1082, 1087 (Ala. 2017) (citing Ala. Code § 6–5–338(a) (1975)).[1]

In deciding a Rule 12(b)(6) motion to dismiss, a district court generally must view the factual allegations in a complaint in the light most favorable to the plaintiff and accept the alleged facts as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1276 (11th Cir. 2023); *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). Under the incorporation-by-reference doctrine, a district court may consider evidence attached to a motion to dismiss without converting the motion into a motion for summary judgment "if the document is (1) central to the plaintiff's claim; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). The incorporation-by-reference doctrine applies to police

---

[1] As discussed below, this immunity extends to supervising officers. Chief Ross and Officer Self rely on the state agency affirmative defense with respect to Mr. Logan's negligence and wantonness claims against them under Alabama law.

body camera footage when the video recording is attached to a motion to dismiss, depicts events central to the plaintiff's claims, is referenced in the complaint, and is not subject to challenge based on authenticity or accuracy. *Baker*, 67 F.4th at 1277–78; *Swinford v. Santos*, 121 F.4th 179, 186–88 (11th Cir. 2024). "[W]here a video is clear and obviously contradicts the plaintiff's alleged facts, [a district court] must accept the video's depiction instead of the complaint's account and view the facts in the light depicted by the video." *Baker*, 67 F.4th at 1277-78; *see Swinford*, 121 F.4th at 190.

Accordingly, the Court presents the facts Mr. Logan alleges in his complaint in the light most favorable to him until the point at which Officer Hughes started his body camera recorder. From the beginning of the recording forward, the Court presents the facts depicted in the video and addresses in footnotes factual allegations in the complaint that are at odds with the video recording.[2]

---

[2] The defendants filed the body camera footage with their supplemental motion to dismiss, (Docs. 14, 15), and Mr. Logan acknowledges that the facts in the complaint are "based on the one minute of video footage Plaintiff's counsel and Plaintiff's brother were allowed to view on Wednesday, November 16, 2022 at the Alabama State Bureau of Investigation [] office." (Doc. 16, p. 8). Mr. Logan relied on the body camera footage in his responses to the defendants' motions to dismiss and does not challenge the authenticity of the footage. (Doc. 16, pp. 8-10; Doc. 17, pp. 7-8). Because Mr. Logan mentioned the body camera footage in his complaint, (Doc. 1, p. 5, 8, ¶¶32, 66; Doc. 1-1, p. 3), and the body camera footage depicts the events that are central to Mr. Logan's claims, (Doc. 15), the Court may rely on the recording without converting Officer Hughes's motion to dismiss into a motion for summary judgment. The Court grants the defendants' motion to supplement their motion to dismiss to include Officer Hughes's body camera footage. (Doc. 14).

## II.

In his complaint, Mr. Logan alleges that in October 2022, he was 71 years old and homeless. He lived in his car and frequently parked his car in neighborhoods in Homewood, Alabama to sleep. (Doc. 1, p. 4, ¶¶ 21-22). On the evening of October 14, 2022, Mr. Logan parked his car on Parkside Circle in Homewood. (Doc. 1, p. 4, ¶ 23). Just before 3:00 a.m. on October 15, 2022, a citizen called the Homewood Police Department because the citizen saw Mr. Logan getting in and out of a car and did not recognize Mr. Logan. (Doc. 1, p. 4, ¶¶ 24-26). The Homewood Police dispatched Officer Hughes to the area to investigate a "suspicious person." (Doc. 1, p. 4, ¶ 27). Officer Hughes arrived at a house located on Venetian Way in Homewood. (Doc. 1, p. 5, ¶ 28).

Officer Hughes's body camera recording of the events that followed begins at 3:02 a.m. Initially, the recording captures Officer Hughes driving his patrol car. (Doc. 15, 00:01-00:26). Officer Hughes parked his patrol vehicle, emerged from the vehicle, and began walking towards a brick house. As he walked, he activated the sound on his body camera and turned on his flashlight. (Doc. 15, 00:30-00:30). Officer Hughes approached the brick house from the left. A picket fence surrounding a yard to the left of the brick house created an alleyway between the fence and the left side of the brick house. The gap between the side of the house and the picket fence was dark; Officer Hughes's flashlight supplied the only light. (Doc. 15, 00:53).

As he neared the house, Officer Hughes said "hello." (Doc. 15, 00:41). A few seconds later, when Officer Hughes stood directly before the alleyway, a figure became visible at the end of the alleyway at the corner of the fence. (Doc. 15, 00:45). Branches from a tree located inside the fence extended into the alleyway and blocked Officer Hughes's line of sight of the person at the end of the alleyway. (Doc. 15, 00:45).

What happened next transpired in just under 15 seconds. As Officer Hughes walked closer to the house and shined his flashlight on the person at the fence, Officer Hughes said "hey," and "what are you doing?" (Doc. 15, 00:45-00:49; *see also* Doc. 1, p. 5, ¶ 38). The person who had been facing the picket fence turned silently to face Officer Hughes. (Doc. 15, 00:45-00:48). The individual, later identified as Mr. Logan, had his left arm at his side; his right arm was raised. (Doc. 15, 00:52).[3] Mr. Logan took three steps toward Officer Hughes. (Doc. 15, 00:52-00:54).[4] As Mr. Logan neared Officer Hughes, Mr. Logan placed his left hand in what appears to be a black bag hanging around his neck, and he dropped his right hand in front of his right leg.

_____

[3] Early in the video recording, it looks like Mr. Logan had a glove on his left hand, but the poor lighting makes it difficult to see Mr. Logan's left hand clearly. (Doc. 15, 00:52). Later, there is clear video evidence of a glove on Mr. Logan's left hand. (Doc. 15, 05:34). Mr. Logan did not have a glove on his right hand. (Doc. 15, 00:53). Mr. Logan alleges that he had been "relieving himself behind a tree or bush [] next to a wooden fence." (Doc. 1, p. 5, ¶ 29).

[4] Mr. Logan asserts in his complaint that he did not "walk toward [Officer] Hughes." (Doc. 1, p. 6, ¶ 45). The video contradicts Mr. Logan's allegation.

Against the dark of Mr. Logan's blue jeans, a gun pointing toward the ground is visible in Mr. Logan's right hand. (Doc. 15, 00:53). The screenshot below shows Mr. Logan's left hand under the black bag around his neck and his right hand down at his side. The gun is difficult to see in the screenshot, but Mr. Logan acknowledges that he was holding a pistol. (Doc. 1, p. 6, ¶¶ 40-41).[5]



(Doc. 15, screen shot of video at 00:53).

Officer Hughes asked "what are you doing?" and exclaimed "hey." As Officer Hughes exclaimed "hey," the sound of the trigger of his gun is audible on the video

---

[5] Mr. Logan alleges that he carried a gun to protect himself. (Doc. 1, p. 5, ¶ 30). Mr. Logan alleges that he held "the pistol in a non-firing grip." (Doc. 1, p. 6, ¶ 44)

recording. (Doc. 15, 00:54). Officer Hughes commanded "drop that, drop," stepped backward, and began firing at Mr. Logan. (Doc. 15, 00:55-00:56). Officer Hughes fired nine shots. (Doc. 15, 00:55-58). Mr. Logan fell to the ground. (Doc. 15, 00:59).

Officer Hughes yelled, "oh shit, shit, shit, shit, shit, shit, shit." (Doc. 15, 1:00-1:03), reported on his radio that shots were fired, (Doc. 15, 1:03-1:05), and stepped backed towards his vehicle, saying, "crap, crap, crap," (Doc. 15, 1:05-1:10). Officer Hughes continued speaking to himself for several seconds and then began walking towards Mr. Logan. (Doc. 15, 01:10-01:30). While still a significant distance from Mr. Logan, Officer Hughes directed Mr. Logan to show his hands. (Doc. 15, 01:34).

Officer Hughes stayed close to his vehicle and called other officers to ask where they were. (Doc. 15, 01:56-01:58). From the street, Officer Hughes said, "Hey, show me your hands buddy. Show me your hands." (Doc. 15, 02:03-2:04). Mr. Logan moved his right arm. (Doc. 15, 02:07). Officer Hughes spoke to someone and explained that he thought that Mr. Logan lived at the brick house and that he had seen Mr. Logan in a car. (Doc. 15, 02:32-02:36). From his vehicle, Officer Hughes instructed Mr. Logan several times to show his hands. (Doc. 15, 02:40-02:57). Officer Hughes commented to the person from dispatch with whom he was speaking that Mr. Logan was "the only one" he saw. (Doc. 15, 03:12). He explained that he was "waiting on more units." (Doc. 15, 03:37). Officer Hughes explained to someone that as soon as the scene was secured, they would "get medics rolling this way." (Doc. 15,

04:27).

Three and one-half minutes after Officer Hughes shot Mr. Logan, he and another officer left Officer Hughes's patrol vehicle and began walking toward Mr. Logan. (Doc. 15, 04:39-05:04). Officer Hughes and the other officer ordered Mr. Logan to show his hands and to not move. (Doc. 15, 5:03-5:34). Officer Hughes handcuffed Mr. Logan and asked him his name and where he was shot. (Doc. 15, 6:28-6:30, 7:18-7:24). Officer Hughes secured Mr. Logan's pistol. (Doc. 15, 6:47-6:51). Until paramedics arrived, Officer Hughes administered first aid for Mr. Logan's wounds on his shoulder and leg. (Doc. 15, 9:20-14:52).

Bullets struck Mr. Logan in his head, left chest/shoulder, left lower leg, right lower leg, and left hand. (Doc. 1, pp. 9-10). Paramedics took Mr. Logan to UAB Hospital where he had several surgeries and remained hospitalized until December 5, 2022. (Doc. 1, p. 8, ¶¶ 64-65). Mr. Logan alleges that he sustained serious injuries to his head; left shoulder, chest, ribs, and hand; and both legs. (Doc. 1, pp. 9-10, ¶ 70). He also alleges cognitive impairment, legal blindness, memory loss, impaired gait and mobility, mental anguish, anxiety, and depression. (Doc. 1, pp. 10-11, ¶ 70).

### III.

### *Claims against Officer Hughes*

Officer Hughes argues that qualified immunity shields him from Mr. Logan's §

1983 excessive force claim and that Alabama discretionary-function immunity shields

him from Mr. Logan's state-law assault and battery claim.  (Doc. 10, pp. 7-19).

Qualified immunity "protects police officers from suit in their individual

capacities for discretionary actions performed in the course of their duties." *Carter v.*

*Butts Cnty.*, 821 F.3d 1310, 1318 (11th Cir. 2016) (citing *Pearson v. Callahan*, 555

U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Bogle*

*v. McClure*, 332 F.3d 1347, 1355 n.5 (11th Cir. 2003).  Qualified immunity offers a

complete defense to officers sued in their individual capacities if the officers'

conduct "does not violate clearly established statutory or constitutional rights of which

a reasonable person would have known." *Harlow*, 457 U.S. at 818.  The doctrine of

qualified immunity "'balances two important interests—the need to hold public

officials accountable when they exercise power irresponsibly and the need to shield

officials from . . . liability when they perform their duties reasonably.'" *Miller v. Palm*

*Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1333 (11th Cir. 2024) (quoting *Townsend*

*v. Jefferson Cnty.*, 601 F.3d 1152, 1157 (11th Cir. 2010)).  District courts determine

whether qualified immunity applies "on a claim-by-claim and defendant-by-defendant

basis." *Miller*, 129 F.4th at 1333 (citing *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir.

2018)).

"To enjoy qualified immunity's protection, a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1323 (11th Cir. 2024) (internal quotations and citation omitted). The discretionary authority "requirement is 'readily satisfied' by 'police officers conducting arrest and investigative functions' while on duty." *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1363–64 (11th Cir. 2024) (quoting *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019)). District courts "look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). If an official carries his initial burden, then the burden "shifts to the plaintiff to show '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Jarrard*, 115 F.4th at 1323 (quotation omitted).

Because Mr. Logan's claims arise out of Officer Hughes's conduct while investigating a citizen's report of a suspicious person, Officer Hughes has met his burden of showing that he acted within the scope of his discretionary authority.

Therefore, Mr. Logan must demonstrate that Officer Hughes violated his constitutional right to be free from excessive force.

District courts evaluate Fourth Amendment excessive force claims like Mr. Logan's under an objective reasonableness standard. *Powell v. Snook*, 25 F.4th 912, 921 (11th Cir. 2022) (internal quotations and citation omitted). Under that standard, courts must "view the facts from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts" and "balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *Powell*, 25 F.4th at 921–22 (internal quotations and citations omitted). A court must pay "'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Kisela v. Hughes*, 584 U.S. 100, 103 (2018) (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)). "[Courts] also consider 'the relationship between the need and amount of force used and the extent of the injury inflicted.'" *Jones v. Ceinski*, 136 F.4th 1057, 1062 (11th Cir. 2025) (quoting *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019) (internal quotation marks omitted). Courts "do not 'mechanically apply . . . these factors.'" *Jones*, 136 F.4th at 1062 (quoting *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015)).

An officer may use deadly force when the officer:

"(1) 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' *or* 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm;' (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible."

*Powell,* 25 F.4th at 922 (quoting *Vaughan v. Cox*, 343 F.3d 1323, 1329-30 (11th Cir. 2003), in turn quoting *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)) (emphasis in *Powell*). "When considering the threat of physical harm to the officer or others," a district court emphasizes "'the level and immediacy of that threat.'" *Powell,* 25 F.4th at 922 (quoting *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016)).

"'The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Kisela*, 584 U.S. at 103 (quoting *Graham*, 490 U.S. at 396). "[W]hen an officer confronts an armed suspect 'in a tense and dangerous situation,' the law does not require the officer to 'hope for the best' and 'wait until the moment a suspect uses a deadly weapon to act to stop the suspect.'" *Jones*, 136 F.4th at 1063 (quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (alteration adopted) (citations and internal quotation marks omitted)); *see also Powell,* 25 F.4th at 922 (stating that though the "mere presence of a gun or other weapon" may not justify the exercise of deadly force, "when a suspect's gun is available for ready use—

even when the suspect has not drawn his gun—an officer is not required to wait and hope for the best") (internal quotations and citations omitted). Confronted with an individual with ready access to a firearm, an officer faces a legitimate threat of harm, and a court "must evaluate the situation 'through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision . . . in circumstances where inaction could prove fatal.'" *Jones*, 136 F.4th at 1064 (quoting *Crosby v. Monroe County*, 394 F.3d 1328, 1334 (11th Cir. 2004)).

To determine whether it was objectively reasonable for Officer Hughes to fire his weapon at Mr. Logan nine times at fairly-close range, the Court considers the circumstances that Officer Hughes confronted. Officer Hughes was investigating a suspicious person at 3:00 a.m. in a residential neighborhood. When Officer Hughes encountered Mr. Logan, Officer Hughes did not have enough information to determine whether Mr. Logan was engaged in criminal conduct. After he shot Mr. Logan, Officer Hughes commented that he thought Mr. Logan may have lived in the brick house and that he had seen Mr. Logan in his car, but there is nothing in the complaint or in the video that indicates that Officer Hughes was familiar with or had specific information about Mr. Logan. If Mr. Logan had lived at the brick house, then he would not have committed a crime by walking in his yard at 3:00 a.m. If he did not live in the house, then he may have been trespassing. Mr. Logan's gloved right hand reasonably might have suggested to an objective officer that Mr. Logan was looking for a way to enter

the brick house to burglarize it. An objective officer would stop and question an individual identified by a caller as a suspicious person who was standing behind a tree at 3:00 a.m. in a dark alleyway beside a residential house to determine if the person was engaged in or was about to engage in criminal conduct. Mr. Logan did not respond when Officer Hughes asked him what he was doing.

A reasonable officer on the scene with knowledge of the attendant circumstances and facts would view the individual Officer Hughes confronted as an immediate threat to the officer's safety. *Powell*, 25 F.4th at 921–22. Mr. Logan did not answer when Officer Hughes asked him what he was doing, but Mr. Logan stepped toward Officer Hughes. Mr. Logan had his left hand in or behind a bag that was hanging around his neck, and he held a pistol in his right hand. Though Mr. Logan pointed the pistol to the ground as he stepped toward Officer Hughes, the pistol was readily available, and Officer Hughes did not know whether the pistol was loaded or whether Mr. Logan might be concealing another weapon in his hidden left hand. As the Eleventh Circuit recently reiterated in *Jones*, Officer Hughes did not have to wait to find out whether Mr. Logan's pistol was loaded or whether he was holding another weapon in his left hand. *Jones*, 136 F.4th at 1063; *see also Powell,* 25 F.4th at 922.[6]

---

[6] In *Powell*, the Eleventh Circuit wrote:

> Our *Shaw* decision drives that point home. In that case an officer used deadly force against a mentally unstable man who had a hatchet in his hand and was advancing on the officer. 884 F.3d 1096–97. The man had not raised the hatchet, but we affirmed the grant of summary judgment for the officer on qualified immunity grounds

An objective officer in Officer Hughes's position would be entitled to use force to protect himself under the circumstances that Officer Hughes confronted.

"The question remains whether [Officer Hughes's] use of force was reasonably proportionate to the need for it." *Jones*, 136 F.4th at 1062 (citing *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002)).  Standing a few yards from Mr. Logan, Officer Hughes fired nine bullets in quick succession over the course of three seconds.  (Doc. 15, 00:55-58).  As he fired, Officer Hughes stepped backwards as Mr. Logan walked towards him.  (Doc. 15, 00:55-58).  In an unpublished decision, the Eleventh Circuit wrote in 2012 that it could not "find a single case in this circuit or from the Supreme Court that establishes that a large number of shots fired makes a reasonable use of deadly force unreasonable."  *Cooper v. Rutherford*, 503 Fed. Appx. 672, 676 (11th Cir. 2012).  In *Jean-Baptiste*, the Eleventh Circuit found that an officer who was standing eight to ten feet from Mr. Jean-Baptiste did not use excessive force and was entitled to qualified immunity when the officer continually fired his gun, shooting 14 bullets, eight of which struck Mr. Jean-Baptiste.  *Jean-Baptiste*, 627 F.3d at 819.  On the facts of that case, the Eleventh Circuit held that the officer "reasonably responded

---

anyway.  *Id.* at 1100–01.  We did so because: "A reasonable officer could have also concluded, as [the officer] apparently did, that the law did not require him to wait until the hatchet was being swung toward him before firing in self-defense."  *Id.* at 1100; *see also Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015).

*Powell*, 25 F.4th at 922 (citing *Shaw v. City of Selma*, 884 F.3d 1093, 1096-1101 (11th Cir. 2018)).

with deadly force, and [the officer] was not required to interrupt a volley of bullets until he knew that Jean–Baptiste had been disarmed." *Jean-Baptiste*, 627 F.3d at 819.

Here, the footage from Officer Hughes's body camera shows that Mr. Logan did not collapse to the ground until Officer Hughes fired his gun the ninth time, and the video does not indicate that in the three seconds during which Officer Hughes fired his gun, Mr. Logan showed Officer Hughes his hands, dropped his pistol, or tried to convey to Officer Hughes that he was not a threat. Under the circumstances depicted in Officer Hughes's body camera video, Officer Hughes's use of deadly force to protect himself was not excessive and did not violate Mr. Logan's constitutional rights.

Mr. Logan argues that he did not have a "chance to hear" and comply with Officer Hughes's command to drop the pistol he was holding. (Doc. 16, p. 9). Under the circumstances of this case, Officer Hughes did not have to warn Mr. Logan to drop his gun and wait to see how Mr. Logan would respond. Officer Hughes had to act within seconds in a tense and rapidly evolving situation. *Swinford*, 121 F.4th at 190; *see Pipkins v. City of Hoover, Alabama*, 134 F.4th 1163, 1173 (11th Cir. 2025) ("The feasibility of a warning is dependent on many variables, two of which are the proximity of the danger to the officer or others and the time available to the officer."); R*obinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005) (upholding the use of deadly force against a person who was driving a car towards the officer where, "[a]t the most,

[Officer] Arrugueta had only 2.72 seconds to react to what he perceived as a threat of using physical harm from Walters.").

Against the backdrop of this binding precedent, the evidence from Officer Hughes's body camera establishes that under the circumstances that Officer Hughes confronted, Officer Hughes did not violate Mr. Logan's constitutional rights when he fired nine bullets toward Mr. Logan in three seconds, Mr. Logan's serious injuries notwithstanding. *See Powell*, 25 F.4th at 924 (stating that "what's clearly established is that it 'is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has probable cause to believe that his own life is in peril'") (quoting *Tillis v. Brown*, 12 F.4th 1291, 1298 (11th Cir. 2021)).[7]   Therefore, Officer Hughes is entitled to qualified immunity on Mr. Logan's excessive force claim.

The same analysis applies with respect to Officer Hughes's affirmative defense of state agent immunity concerning Mr. Logan's state law assault and battery claim.

> The restatement of state-agent immunity set out by the Alabama Supreme Court in *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000), governs whether the officers are entitled to immunity under § 6–5–338(a).  *Brown v. City of Huntsville*, 608 F.3d 724, 741 (11th Cir. 2010) (citing *Ex parte City of Tuskegee*, 932 So. 2d 895, 904 (Ala. 2005)).  The test laid out in *Cranman*, as modified by *Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006), provides in relevant part:

---

[7] *Compare Turk v. Bergman*, 685 Fed. Appx. 785, 788 (11th Cir. 2017) (finding a factual dispute regarding whether Mr. Turk, who was suicidal and had a gun on his lap in his car, "posed an immediate threat of serious bodily harm to [] officers" if he was not holding a weapon when he was shot and "made no threatening moves towards the police").  As noted, Mr. Logan did not respond to Officer Hughes's questions and stepped toward Officer Hughes in a dark alleyway with a gun in one hand and his other hand in or beside a bag that hung around his neck.

> A State agent shall be immune from civil liability in his or
> her personal capacity when the conduct made the basis of
> the claim against the agent is based upon the agent's ...
> exercising judgment in the enforcement of the criminal laws
> of the State, including, but not limited to, law-enforcement
> officers' arresting or attempting to arrest persons, or serving
> as peace officers under circumstances entitling such officers
> to immunity pursuant to § 6–5–338(a).

*Ex parte City of Homewood*, 231 So. 3d 1082, 1087 (Ala. 2017) (internal
quotation marks and citations omitted).  In other words, law enforcement
officers are immune from tort liability for conduct within the scope of
their discretionary law enforcement duties. *City of Huntsville*, 608 F.3d
at 741.  Nonetheless, a state agent is not entitled to state-agent immunity
if (1) the U.S. Constitution, federal law, the state Constitution, or state
laws, rules, or regulations enacted or promulgated for the purpose of
regulating the activities of a governmental agency, require otherwise; or
(2) the agent acts "willfully, maliciously, fraudulently, in bad faith,
beyond his or her authority, or under a mistaken interpretation of the
law." *City of Homewood*, 231 So. 3d at 1086; *Cranman*, 792 So. 2d at
405.

The test for state-agent immunity follows a similar burden-shifting
framework as the test for qualified immunity. First, the state agent
asserting immunity "bears the burden of demonstrating that the
plaintiff's claims arise from a function that would entitle the State agent
to immunity." *Ex parte City of Montgomery*, 272 So. 3d 155, 161 (Ala.
2018) (quoting *Ex parte Kennedy*, 992 So. 2d 1276, 1282–83 (Ala.
2008)).  The burden then shifts to the plaintiff to show that one of the
two exceptions to immunity recognized in *Cranman* applies. *Id.*
. . .

The Alabama Supreme Court has largely equated qualified immunity
with discretionary-function immunity, and so the same facts which
establish an entitlement to qualified immunity may also establish that
the officers are entitled to discretionary-function immunity. *Sheth v.
Webster*, 145 F.3d 1231, 1240 (11th Cir. 1998) (per curiam); *id.* at 1239
("Under both Alabama law and federal law, the core issue is whether a
defendant violated clearly established law.").

*Hunter v. City of Leeds*, 941 F.3d 1265, 1283–84 (11th Cir. 2019).

Officer Hughes has demonstrated that he was performing a discretionary law enforcement function in investigating a suspicious person. "Police investigations and arrests usually are considered discretionary function[s] within the line and scope of . . . law enforcement duties for the purposes of discretionary-function immunity." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1268 (11th Cir. 2010) (internal quotations and citations omitted). Therefore, Officer Hughes is entitled to discretionary-function immunity on Mr. Logan's assault and battery claim unless Mr. Logan can show that Officer Hughes violated his constitutional rights or acted "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Cranman*, 792 So. 2d at 405.

As discussed, based on the video evidence, Mr. Logan cannot show that Officer Hughes violated his constitutional right to be free from excessive force. Mr. Logan conclusively alleges that Officer Hughes was "willful, wanton, malicious" and that he fired shots "with reckless disregard for [Mr. Logan's] rights and safety." (Doc. 1, p. 19, ¶121). Mr. Logan has not alleged facts, and the video evidence does not show, reckless, willful, wanton, or malicious conduct. To the contrary, footage from Officer Hughes's body camera shows that he backed away as Mr. Logan stepped toward him; after he retreated to his patrol vehicle, he waited impatiently for backup to arrive so that he could check on Mr. Logan; and he rendered first aid to Mr. Logan until

paramedics arrived.  In a calm voice, Officer Hughes tried to assure Mr. Logan that the officers at the scene were trying to provide care until paramedics arrived.  Given this video evidence, the Court disregards Mr. Logan's unsupported, conclusory allegation of reckless and malicious conduct.  *Brivik v. Law*, 545 Fed. Appx. 804, 807 (11th Cir. 2013) (finding that a conclusory allegation that a police officer acted maliciously and in bad faith was "insufficient to survive a motion to dismiss").

Mr. Logan argues that Officer Hughes acted beyond his authority when he shot Mr. Logan.  (Doc. 16, pp. 28-29).  A state agent acts beyond his authority when he "fail[s] to discharge duties pursuant to detailed rules and regulations, such as those stated on a checklist."  *Howard v. City of Atmore*, 887 So. 2d 201, 208 (Ala. 2033) (internal quotations and citations omitted).  Mr. Logan argues that Officer Hughes is not entitled to discretionary-function immunity because he "was acting outside the line and scope of his enforcement duties" because Officer Hughes did not follow the City of Homewood Police Department's Use of Force Policy when he shot Mr. Logan. (Doc. 16, pp. 28-29).[8]  As explained, under the circumstances that confronted Officer

---

[8] Mr. Logan alleged in his complaint that the "City of Homewood's policies on the use of force and training of its [police] officers are inadequate," (Doc. 1, p. 16, ¶ 98), and that the City of Homewood "found the shooting of and subsequent use of force" against Mr. Logan "to be within and consistent with the City of Homewood Police Department's policy," (Doc. 1, p. 13, ¶ 84), but Mr. Logan has not specifically identified Homewood Police Department's Use of Force Policy in his complaint. Mr. Logan included the text of Homewood's use of force policy in his response to Officer Hughes's motion to dismiss.  (Doc. 16, pp. 39-21).  The Court recognizes that Mr. Logan could amend his complaint to add specific allegations concerning the HPD's policy.

Hughes, he did not use excessive force against Mr. Logan. Mr. Logan has not alleged how Officer Hughes violated HPD policy other than by allegedly using excessive force.

For the reasons that Officer Hughes is entitled to qualified immunity on Mr. Logan's § 1983 claim, Officer Hughes also is entitled to discretionary-function immunity on Mr. Logan's state law assault and battery claim. Therefore, the Court will dismiss Mr. Logan's claims against Officer Hughes.

### Claims against the City of Homewood, Chief Ross, and Officer Self[9]

For Mr. Logan to establish a § 1983 claim against the City of Homewood based on municipal liability, Mr. Logan must plausibly allege that "(1) his constitutional rights were violated, (2) the municipality had a policy (or custom) that constituted deliberate indifference to that constitutional right, and (3) the municipal policy (or custom) caused the violation." *Baker*, 67 F.4th at 1282. "Supervising officers can be held independently liable under § 1983 for a failure to train their subordinates 'either when the supervisor personally participates in the alleged constitutional violation or

---

[9] These defendants argue that Mr. Logan abandoned several of his claims against them because he did not respond to their arguments in his response to their motion to dismiss. (Doc. 18, p. 5). At the motion to dismiss stage, a plaintiff does not abandon his claims by not responding to the defendants' arguments. *See Boyd v. Peet*, 249 Fed. Appx. 155, 157 (11th Cir. 2007) (finding that "at the motion to dismiss stage, the scope of a court's review must be limited to the four corners of the complaint" and that the "district court erred by going beyond the face of the complaint" in finding that Boyd abandoned his claims "by failing to adequately address them in his response brief") (citing *St. George v. Pinellas Co.*, 285 F.3d 1334, 1337 (11th Cir. 2002), for the proposition that a district court is limited to the "four corners of the complaint" at the motion to dismiss stage). The "appropriate inquiry at this stage of the litigation [is] whether the allegations of the complaint plausibly indicate that [Mr. Logan] has a claim for relief." *Boyd*, 249 Fed. Appx. at 157 (alterations added). Accordingly, the Court addresses Mr. Logan's claims against these defendants.

when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation.'" *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 820 (11th Cir. 2017) (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990)).

Here, because there was no constitutional violation, Mr. Logan's municipal liability claims against the City of Homewood "fail[] as a matter of law." *Baker*, 67 F.4th at 1282; *see Banuchi v. City of Homestead*, No. 22-12375, 2024 WL 2014424, at *6 (11th Cir. May 7, 2024) (finding that a custom or policy cannot be the moving force of a constitutional violation under *Monell* when there is no constitutional violation).[10]  Likewise, there is no supervisory liability under § 1983 against Chief Ross or Officer Self for failure to train or ratification "when there is no underlying constitutional violation." *Knight*, 856 F.3d at 821; *Hicks v. Moore*, 422 F.3d 1246, 1253 (11th Cir. 2005) ("Because we conclude that Plaintiff's constitutional rights were not violated by the search, Plaintiff cannot maintain a § 1983 action for supervisory liability against Sheriff Moore, Captain Ausburn, or Sergeant Gosnell for failure to train.").

---

[10] Mr. Logan acknowledges that "[i]n *Banuchi*, it was determined that there was no constitutional violation, so there would be no constitutional violation under *Monell*." (Doc. 17, p. 17).  Mr. Logan argues that the Court should allow him "to conduct meaningful discovery prior to any resolution based on disputed facts" and that he "should be afforded the opportunity to prove that he suffered a constitutional violation prior to wholesale dismissal." (Doc. 17, pp. 17-18).  As discussed, the video evidence in this case establishes that Officer Hughes did not violate Mr. Logan's constitutional rights. Therefore, discovery would be futile.

Chief Ross and Officer Self argue that they are entitled to state-agent immunity for Mr. Logan's claim against them for negligent and wanton hiring, training, supervision, and discipline of Officer Hughes. (Doc. 8, pp. 16, 24-25). Under *Cranman*, a state agent is immune for "'formulating plans, policies, or designs'" or for "'exercising his [] judgment'" in hiring, firing, transferring, assigning, supervising, or training personnel. *Howard*, 887 So. 2d at 210 (quoting *Cranman*, 792 So. 2d at 405). Under *Cranman*, Chief Ross and Officer Self are immune from Mr. Logan's negligent hiring, training, supervision, and discipline claim.

Mr. Logan argues that Chief Ross and Officer Self are not entitled to state-agent immunity because they "acted in bad faith and beyond their authority when they provided no supervision or training" to Officer Hughes "regarding restraint in the use of force." (Doc. 17, p. 15). Mr. Logan asserts that "[i]t is obvious that needed training was absent in the instant case." (Doc. 17, p. 16).

As discussed, the video evidence shows that Officer Hughes did not use excessive force against Mr. Logan under the circumstances of this case. In other words, the video footage demonstrates that the force Officer Hughes used was objectively reasonable even though the force used caused Mr. Logan significant injuries. Because the video evidence contradicts Mr. Logan's assertion that Officer Hughes used unconstitutional force, an alleged lapse in training did not cause Mr. Logan's injuries. Mr. Logan's conclusory allegations that Chief Ross or Officer Self

acted in bad faith, beyond their authority, or with wantonness fail to state a claim against these defendants. *See Brivik v. Law*, 545 Fed. Appx. 804, 807 (11th Cir. 2013) ("Brivik's allegation that Officer Law acted maliciously and in bad faith is conclusory and therefore insufficient to survive a motion to dismiss.").

Because Chief Ross and Officer Self have state-agent immunity on Mr. Logan's negligence and wantonness claims, the City of Homewood also is immune on these claims. *See Berry v. City of Montgomery*, 99 So. 3d 282, 298 (Ala. 2012) ("It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then pursuant to 6-5-338(b), the city by which he is employed is also immune.") (internal quotations and citations omitted). Moreover, under Ala. Code § 11-47-190, the City of Homewood cannot be liable for the alleged wanton conduct of its employees. *Ex parte City of Orange Beach*, No. SC-2024-0526, 2025 WL 1007962, at *9 (Ala. Apr. 4, 2025) (construing § 11-47-190 to exclude liability for wanton misconduct). Therefore, the Court will dismiss Mr. Logan's negligence and wantonness claims against the City of Homewood, Chief Ross, and Officer Self.

## IV.

Consistent with the discussion in this opinion, the Court grants the defendants' motions to dismiss. By separate order, the Court will dismiss Mr. Logan's claims in this case.

The Clerk shall please TERM Docs. 7, 9, and 14.

**DONE** and **ORDERED** this August 22, 2025.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE